May it please the Court, my name is Ian Simpson and I represent Mr. Sean Kovaly. Texas health care providers set the standard for Texas health care practice. That's from the common law, that's from the Texas Supreme Court, and that's the way it's always been. What we're here about today is a fairly narrow question of Texas health care law. What is it that sets the standard for a pharmacist in professional practice? To go into the facts a little bit here, Mr. Kovaly presented to Houston Northwest Medical Center on August 28, 2012, showing chest pain. He emerged two days later with a new cardiac stent and a fistful of prescriptions. One of those, and the one we're really here about today, was for Plavix. Plavix is a blood thinner, and it's important for a cardiac patient, particularly someone who's just received a stent, because what it does is it combats the body's natural immune response. The natural immune response is the clot around a foreign body, something that the body doesn't recognize. Well, a stent falls into that category. I don't see that your legal arguments really depended all on the details of what drug was being prescribed. It could have been any prescription drug, couldn't it? There is in fact— Maybe it goes to damages, I don't know, but it doesn't go to the question of any— I'll move ahead, Your Honor. I think you'll see a certain relevance to it with it being Plavix, but at any rate. Mr. Cavalli went to Walmart to get his prescriptions filled, and it's undisputed that there was one small problem with the prescriptions that he was written. His physician had omitted the total number of pills to be dispensed to him, not the dosage, not the medication, but the total number of pills that were to go into the bottle. As a result, Mr. Cavalli didn't get his Plavix. The pharmacist at Walmart, Ms. Nguyen, has noted in the briefing that she'd been a pharmacist for only about four days. There's no dispute as to her qualifications. Nobody's saying that she is unqualified to do her job, but that she made a mistake here, did not adhere to the standard of care. What is Ms.—what is Brooke basing his opinion on except his own belief and interpretation of the statute? Did he reference other materials, textbooks, curricula, the kind of things that you would need to, you know, establish— What he references, Your Honor, is his very substantial experience as a professional pharmacist. This is a man who actually has sat on the Texas Pharmacy Board. He references that experience. He's been in pharmacy practice for well over 30 years. He has owned pharmacies. He has practiced pharmacy. He has education, experience, and training in pharmacy. He's been a lecturer. This is the kind of stuff, this kind of experience that forms the basis of—forms the background and upon which Texas healthcare practitioners rely. Ultimately, the trial court held that Mr. Brooke's opinion was unfounded, that it was based strictly on his belief, and in particular, that it required—that his opinion, if followed, would have required Ms. Nguyen to actually break the law, break this regulation that is cited by Wal-Mart. But that's a moreover opinion. I mean, the court's opinion could stand without that paragraph, couldn't it? It could, Your Honor. That's the problem. That's why I'm asking you what else supports his—because you have to say that the court was wrong in its performance of its gatekeeping function. Even if I agree with you that it didn't necessarily require him to violate Texas law, don't you still lose unless you can show it's just overwhelming that it's so well-supported? And it is overwhelming, Your Honor, because the thing that is the basis for a Texas healthcare professional is, in fact, this kind of background, this kind of education, background, and experience. It's not him pointing to outside sources. The appeal to authority doesn't work in this area. What is key is that he be able to show that he has the qualifications to speak to this and that basing it upon his experience, that he has—that this is what healthcare providers in Texas do and this is what healthcare providers in Texas rely upon. This comes from Palacios and a whole line of Texas case law. The Texas Supreme Court has long said that the standard of care for a reasonable healthcare provider is what a reasonable healthcare provider does. Now, that is obviously something of a tautology, but that is what the Texas Supreme Court has advised us for many, many years. It is the foundation of it in common law. Now, as far as the regulations and that argument that is put into place by the trial court and raised by Wal-Mart, only when a statute of regulation really defines a course of action and a course of conduct that differs from the common law does it create any kind of expressed standard of care. The reasons for that are many fold, but just considering the impracticality of a regulation attempting to define a standard of care, a regulation can certainly set a core standard and Texas cases recognize that, but the problem is that there is no way that a regulation written in a vacuum or even with reasonable information about what a pharmacist does every day could possibly consider every single situation that a pharmacist, actual practicing pharmacist faces in a year, a month, a week, or even a day. In your view, in this case, whether it's the common law experience or whether it's any statute of regulations, is there a difference in Texas, in your view, between a new prescription and a renewal prescription as it affects the 72-hour provision? No, Your Honor, there's not. Well, correction, let me backtrack from that just a little bit, Your Honor. It depends upon the particular pharmacist's professional judgment. The essence of the rule is in the exercise of professional judgment. So for one class of drug, it might be appropriate. For another class of drug, it doesn't. And here's where I get into the notion of FLAVIX being important. Well, is there a specific provision anywhere in Texas law regarding allowing 72 hours of prescription for a renewal? For a renewal, yes, there is, Your Honor. But that provision does not exist for a new prescription, is that right? That's correct, Your Honor. And yours here was a new prescription? This was a new prescription. What in fact, the 72-hour provision that deals with renewals, that allows a 72-hour supply where there is no current prescription, where in fact the current prescription needs to be renewed. There has been a prescription for some period of time, say it runs out on a Monday, can't get to the doctor until Thursday. It does allow a pharmacist to, in that case, in order to avoid an interruption in a course of therapeutic treatment, to give an emergency supply despite the fact that there is no current prescription. And what is the source of that? That in fact is regulation, regulation and statute, Your Honor. And let's see. All right. That's okay. You don't need to take time.  It's stated in the briefing, Your Honor. Is there any authority for the experts opining that a similar rule applies to the new prescription where it's medically necessary? Other than him saying, other than the experts, oh, Nipsey Dixit, that that's what the standard of care is. Forty years of pharmacy practice, Your Honor. Forty years of doing it. The… Right. But can't the district court perform its gatekeeping function and say that for whatever reason that's not satisfactory? The thing that the district court kept looking for was some kind of law, some kind of regulation. These aren't made by laws and regulations. These are made by doctors. Well, but because there's a regulation on the similar provision. You can see why the court would have looked for that. Absolutely, Your Honor. And I'm not saying that this was some kind of crazy hold. There's, this is, this is a fine line distinction. And I absolutely recognize that that is a distinction that I'm making. But what we have here is there was a current prescription here. A current prescription that missed only one small detail. The number of pills to be put in the bottle. So you don't think that this is a, it's not a renewal, but the current prescription just misses the quantity. Exactly. So it would have otherwise been a valid prescription. It would have otherwise been a valid prescription and there's, there's no dispute over that, Your Honor. The other thing is that the nature of this being Plavix, any pharmacist is going to tell you that Plavix usually gets prescribed for life. That is something that a cardiac patient is going to go on. Is that in the expert testimony? Yes, it is. You're on. Yes. There is that. And in fact, Ms. Nguyen herself testified that the, the, uh, the prescriptions that Mr. Kovale presented were classic for a cardiac stent patient. Do you have any authorities that said that it's okay to testify in a way that appears to be in conflict with the regulation for a standard of care? Do you have in any context whatsoever? This has come up so little, Your Honor. This is, this is almost a case of first impression. So I've seen very little where we talk about regulations setting a standard of care. The one case that I have seen that deals with particularly . . . Not setting the standard, but, but limiting the standard, where they provide an outside perimeter of the standard, that sort of thing. There's nothing that I can think of off the top of my head, Your Honor, I'll, I'll confess. There is a case called Morgan v. Walmart, funnily enough, that the court might find informative, and in that case, uh, the Austin Court of Appeals declined to hold that the, uh, that a particular regulation set a standard of care for pharmacists. In particular, that was dealing with, uh, at, at a, uh, with providing information, um, to, uh, a patient. And the, the Court of Appeals declined to hold that that was, that that imposed any kind of duty upon Walmart. Now that's obviously a little bit of a different case from what we've got here. Here we've got Walmart saying they can't possibly have this duty because of what the, you know, what, what the, the regulation says. Um, they say that the regulation defines exactly what it is that Walmart must do and defines exactly what it is that Walmart must not do. In fact, the regulation is at best an imprecise fit here because the regulation does not deal with a current prescription that is simply missing an element. Uh, the, now, Mr. Cavalli is not arguing that Ms. Nguyen should have issued him six months worth of medicine or even a month's worth of medicine. This is 72 hours to avoid having a therapeutic course interrupted. And because it's Plavix, it was really important because the, the results of, of, of missing Plavix could be much, much worse. In fact, in this case, they were much, much worse. Mr., uh, Mr. Cavalli had to return to the hospital after his prescription wasn't filled for about six days. Um, he finally, he, he got back to the hospital with, with, you know, renewed chest pain. Uh, there was clotting found around the stent. He required additional treatment, additional hospitalization. Um, the underpinning to the trial court decision, I think, is that, uh, you know, if you look at it from the standpoint of the regulation, is that the regulation applied and set the standard of care, um, and, you know, if it covered this situation, it dictated what a pharmacist must do in this situation. Mr. Cavalli's position is that it did not actually cover this situation. Um. What does the regulation say specifically? The actual, it is, it is actually, well, there's, there, there's a statute and there's a regulation. There's a statute section, uh, Health and Safety Code section 43.014, which is, uh, fairly long. It's in the briefing. Uh, it's in the, uh, starts on page 18 of Mr. Cavalli's brief. And, uh, the, the regulation itself says that pharmacists shall exercise sound professional judgment with respect to the accuracy and authenticity of any prescription drug order they, uh, they dispense. If the pharmacist questions the accuracy or authenticity of a prescription drug order, he or she shall verify the order with the practitioner prior to dispensing. Um. The, the, the second one, again, prior to dispensing a prescription, dispensing a prescription, pharmacists shall determine in the exercise of sound professional judgment that the prescription is a valid prescription. The complaint here from Wal-Mart was that this was not a valid prescription because it was missing this one little element. But Mr. Cavalli's position is that the exercise of sound professional judgment is the heart of this regulation. And that what this does is it reinforces the common law standard with respect to a particular course of conduct. And I see that I am about out of time, unless the court has anything that it wants me to address immediately. I will save the rest of my time for rebuttal. Thank you. You've saved time for rebuttal, Mr. Simpson. Thank you. Mr. Jackson. May it please the court. Counsel. Your Honors, this case to me is like a person who builds their house on a foundation of sand. When the rain and winds come, the house falls. In this case, the foundation of sand are the, is the basis of Mr. Brooks' opinions. But the foundation of sand is what you use to attack the expert witness on the witness stand once the case has gone to a, to a fact finder. Well, Your Honor, that's part of it. But in addition, when the court exercises its gatekeeper function under Dalbert, the court has to examine both the relevancy and the reliability of the expert's opinions. And in this case— But what would not be reliable about an opinion from a professionally qualified person with 40 years' experience who'd sat on the state pharmacy board, whatever the exact name of it is, who gives his opinion about what would constitute sound professional judgment under the statute and regulations? Well, the problem with Mr. Brooks' opinions is that the opinions he tried to offer were not based upon the regulations and the statutes applicable to pharmacists. As Mr. Cavalli's attorney pointed out, he recognizes some of the statutes and some of the regulations applicable to a pharmacist, but he doesn't recognize all of them. But again, that's, that's not necessarily a reason not to let him pass the gate of being able to sit in the witness chair under oath and be subjected to questioning that might very well undermine his opinion in the view of the fact finder. Well, Your Honor, I would respectfully disagree, and the reason is, is because under the Texas Administrative Code, this case involves not what Mr. and Mr. Cavalli's attorney was referring to as a current prescription. This was a new, original prescription. But the regulation doesn't, the regulation doesn't prohibit the standard of care by the, the physician's standard of care is not determined by the regulation only. And he's not saying that there was an explicit statutory requirement to dispense the drug. He's saying that consistent with practice in the industry and the other regulations and all of this sort of thing, a reasonable pharmacist could have or should have dispensed a 72-hour emergency fly. There's no requirement that this explicitly contradicts the regulation. I mean, this, this, so he's just saying in general, informed by these things, this is the standard of care. Why isn't that completely within the bounds, assuming it's supported by research and that sort of thing? Well, there's a, there's a couple of reasons. Number one is, it's not supported by really anything other than. That's a different question. Putting that to one side. Just, he's not really contradicting the regulation. And even if he was, there could be circumstances where the standard of care requires a deviation from a regulation. For example, a traffic statute could be violated to do a high standard of care in some hypothetical involving having to get somewhere quickly or something. There are certain, so regulation doesn't always trump, it doesn't trump standard of care in Texas. Well, in this case, your honor, I think that the regulations do help define what is permissible and what is not permissible for pharmacists. I don't think that they're allowed to simply do anything that they want. The statutes, for example, under 293.31 of the administrative code defines what constitutes accurately as prescribed, dispensing, delivering, and or distributing a prescription drug order to the correct patient with the correct drug and the correct strength, quantity, and dosage form ordered by the practitioner. And then later, under 22291.32, it says a dispensing pharmacist shall, which is mandatory language, be responsible for and ensure that the drug is dispensed and delivered safely and accurately as prescribed. So this term of art, accurately as prescribed, mandates with language that is required that an original prescription shall have the quantity. And that's reflected also in 291. But the standard of care in an emergency action, it doesn't necessarily have to run in lockstep with a regulation, does it? And even, in fact, complying with the regulation wouldn't be a shield as to say that that therefore met the standard of care. And we know that from the CVS Ballard case, that even complying with the regulation doesn't mean you meet the standard of care. So the converse is also true, isn't it? Well, in the CVS versus Ballard case, that situation involved an expert witness who was being challenged under Chapter 74 of the Texas Civil Practice and Remedies Code. And I think that the distinction there is that that is a different analysis that a court conducts in terms of determining whether or not that gatekeeping function is going to be. It's still a gatekeeper function. But I— We have very few cases to look at for instructive guidance. Correct. But I think in the CVS versus Ballard case, in that case, Your Honor, the court took a look at the situation involving CVS, and the question there was, again, accurately as prescribed. In that case, the pharmacist actually had a complete valid prescription. The prescription itself was complete. It wasn't missing any elements. And in that case, the pharmacist did prescribe the prescription because it met the requirements under 291.34b7 of an original prescription. But there was still the point that it breached the standard of care, even though it complied with the regulation. Well, I think that's— The court allowed that. And I think that's a—yes, I think that's a distinction between that case and this case. In this case, you don't get to that point because you don't have a valid prescription. There is not a— Well, my question is, does this contradict a valid regulation? It seems like there's a gap, because there's not a situation that says in an emergency situation with a new prescription, you must—you are forbidden from doing X, Y, or Z. There's not—there's a general rule, general regulation, but there's not an emergency provision like there is in the other. And you could infer from that that they don't mean to give an emergency, and therefore the standard of care. But if you have somebody with 40 years' experience on the pharmacy board, you could also infer the opposite. Well, that's possible, but I think that the regulations themselves address the distinction between a refill situation, which we see in the Occupations Code and in the Administrative Code, when you are allowed under an emergency situation to prescribe a 72-hour dose. But that's because there's a history of this person having this prescription filled. It's not an original new prescription. Can't they testify that it's like an analogous—that it's a custom in the industry? If you don't want to use standard of care, couldn't you testify that the custom in the industry is in this circumstance, you don't apply the regulations specifically? That would be allowed in other contexts? I think in the case involving pharmacists, I think there is much more specific regulation in terms of what is allowable and what is not allowable. Well, can't you cross-examine him on that and say, wouldn't they run afoul of this and they could lose their license and that sort of thing, and this is why you're wrong, Doctor? Well, I think in this case, Judge Atlas made a determination that the basis of Mr. Brooks' opinions were unreliable because he was basing them on a 72-hour rule that's not applicable to new prescriptions. If we—well, if he doesn't need the rule, though, if we set aside the part of her opinion that begins, moreover, it would require you to violate the law, and if we don't agree with that part of the opinion, tell us how you still win. Your Honor, I told you that we still win because the trial court has to exercise that gatekeeping function. And in order to do so, what Judge Atlas did was examine the basis of the opinion of Mr. Brooks, which matches their pleadings, says that the 72-hour rule is the standard. Well, let's get back to Rule 702, and let me just mention to you that I chaired the Federal Rules of Evidence when we wrote Rule 702, so I'm pretty familiar with it. And I thought that Mr. Simpson's brief, pages 7 through 10, his opening brief covered it pretty well, though not in great detail, and he points out that this gatekeeping function is not designed to determine the correctness of the opinion, but only to examine things like principles and methodology. Now, most of the discussion that we've been hearing here today has to do with the correctness of the opinion, which is what you would argue to a jury on opening and closing argument or in presentation of other witnesses that you might have. But it seems to me that a witness like this testifying from good credentials and more than substantial experience can testify to what he understands as a professional. And if he's incorrect, you tell the jury that. I think there is a difference between attacking the opinion of Mr. Brooke as far as it being correct or incorrect, and attacking the basis of the opinion as being unreliable. And in this case, Judge Atlas, who determines the law of the case, determined that the law of Texas was contrary to what Mr. Brooke was trying to opine, namely that a 72-hour rule should be created, quite frankly, from his own ipsy-dixit pronouncement, that the 72 hours should be applicable to new prescriptions, to refill prescriptions, really to any situation. Well, probably it's not that broad. I haven't looked at it, but it's probably not that broad. It probably relates to somebody who gives you a fistful of prescriptions that makes it clear that he's a new stent patient, and his knowledge or the pharmacist's knowledge that if I don't fill this prescription, this man may die, and he could have. Maybe he did. I don't know. But he could have. So the prescription. Let me ask you something. Was this patient Medicaid? Was the patient—is there anything in the record about how Walmart was going to get paid? No, I don't believe so. I don't think it was a Medicaid situation. I don't think it was a pre-authorization type of situation or anything like that. So to my knowledge, that was not part of the record as to how Walmart was going to be paid. But I think that one of the key factors to consider in this whole issue does have to do with the potential criminal prosecution of Ms. Wynn. I think we pointed out in our brief, and we pointed out very clearly in our brief, that under 483, there is the possibility that Ms. Wynn would be prosecuted if she issued a prescription without the quantity. And in 483.001.12, Mr. Cavalli's attorney points out the definition of practitioner and accurately cites that portion of the statute, but fails to examine 483.001.13, which defines what a prescription is. And then under that section, it includes that a quantity must be included. And the failure to comply with that could potentially result in a felony prosecution. And so I think that it would definitely be against public policy, and I think it would be against the standard of care as well, to have a pharmacist fill a prescription that could result in criminal prosecution. And there's really not a counter that I've seen to that argument. Well, what about the language from the regulation that Mr. Simpson quoted that says the pharmacist shall exercise sound professional judgment? I think that pharmacists do have to exercise sound professional judgment in the context of the regulations and in the context of the codes that are applicable to their issuing of prescriptions accurately as prescribed. I think that... So you're saying, I mean, I take it that what you're saying is, let's just put, let's just say you were in the position of this patient, and all of us have been in the situations where we've got to have a prescription filled and something's the matter with it, like what we're talking about. And you go in and the pharmacist can look at that prescription and understand that the And in my professional judgment, I better go ahead and give him 72 hours worth of these pills. And one thing you know for certain, he'll be back. Okay. So, I mean, you're saying that there's no room for professional judgment in that situation. As a matter of law, there is no room for professional judgment is what you're saying. I believe... And even if it were you, that would be your answer. There is no room for professional judgment. Well, I hate to substitute myself in that. Well, you better. You might as well. It could be me. It could be any of us. Judge King, in that situation, I would have tried to have done exactly what they did do, which is to try and contact the practitioner. The rule that was cited indicates that one of the fallback positions is to try and contact the practitioner. And if there is the ability to contact someone, for example, sites for example, somebody in the practitioner's practice group that would authorize that, then the pharmacist can then issue the prescription. But my position would be, even if it was me, I would understand that the pharmacist, without that quantity, is not authorized to issue a new prescription or even a 72-hour dose. Professional judgment doesn't come into play. What you're saying is, if it doesn't have that thing filled in there, church is out. That's the end of it. I think that's part of their professional judgment. If it doesn't have the quantity, the statutes have mandatory language about what a prescription shall have and what a pharmacist must do in terms of issuing a prescription accurately as prescribed. And I do believe that the potential for criminal prosecution is very real. And I don't think that there's ever been anyone, I don't think Mr. Brook has offered the opinion that that's not a possibility. And so I think that, in this case, that possibility for her to be prosecuted criminally is significant. Do you have any case that says, as a matter of law, the standard of care can never require violation of a statute or a regulation? No, I don't. Assuming, arguendo, that the court were to disagree that the regulation would in fact have to even be violated, because if it's silent or there's some wiggle room. Tell me, can you tell us how the judgment could nevertheless be affirmed? I think that the judgment can be affirmed in a few ways. I think, number one, in looking at the rationale behind Judge Atlas's decision, she carefully examined the basis of the opinions, and she pointed out that it has to be both relevant and reliable. Wouldn't 40 years in pharmacy board be reliable in a normal case? I think not when it's so contrary to the Texas law. But assuming, arguendo, that it's not so contrary, that's the premise of the question, then ordinarily this would be enough. In a complete vacuum, it possibly would be. But I think it's not in a vacuum. I think it's bound by the code and by the regulations that apply to pharmacists. And I think that's one of the reasons that pharmacists do have these very specific requirements that are mandatory, is because they're dealing with these class of what are known as dangerous drugs. So, I think in closing, I would just point out that on appeal, Mr. Kovales has a large burden to meet. It's an abuse of discretion standard. The abuse of discretion standard is quite high. It requires this court to not substitute its opinion for the trial court's decision. And there is wide latitude recognized in Judge Atlas's decision to strike this particular person. It is true that under abuse of discretion, we do rarely overturn evidentiary issues. I think also some of the factors that were considered were the standards controlling the theory. And I think when Judge Atlas looked at some of the standards that were controlling the theory, that was one of the things that she found to be unreliable with respect to Mr. Brooks' opinions. And in closing, I would just say that I think this case is fairly straightforward. I think there are some complexities to it, but I think that Judge Atlas made the correct decision, which has given great deference and wide latitude. And I think that once the expert, Mr. Brooks, was struck, she properly granted summary judgment in favor of Wal-Mart. And I thank you for your time. All right. Thank you, Mr. Jackson. Mr. Simpson? Let's just follow up a minute on this abuse of discretion standard. I'm sure you agree that that is the standard. And you may have undercut your case a little bit on opening argument when you said, I'm not saying this was some kind of crazy holding. It's a fine line distinction. If that's the case, then Judge Atlas was maybe within her discretion in making this ruling, given the broad latitude that we allow. Except that there's not discretion to get the law wrong, Your Honor. And that's what happened here. Because the Texas law is what formed the basis for this. And the holding on Texas law was plainly incorrect. This wasn't a factual consideration. What was the holding on Texas law specifically that you say was incorrect? Specifically the standard of care for a pharmacist and how it is derived. The standard of care is derived from professional experience and the qualification of an expert is derived from experience, as opposed to looking at regulation or statute or some other kind of, you know, appeal to authority. So when she says plaintiff argues that the Texas Administrative Code provisions do not define the standard of care for pharmacists, and then she says plaintiffs cite no legal authority to support the opinion that a pharmacist has a standard of care inconsistent with and contrary to Texas state law. So you believe that this statement is saying that the TAC defines the standard of care? Well, and the other thing, in part certainly, Your Honor. But also the Texas Supreme Court has long held that the reasonable health care practitioner standard is what qualifies and sets the standard of care. And here we heard that the standard of care is something different. We had a reasonable health care practitioner here. And this was a classic battle of the experts, Ms. Nguyen versus Mr. Brooke. That was the discussion that was happening. I had a couple of things. So the opposite expert opinion, in your view, should have been stricken because it misstated the law and it should never have been allowed or considered? Well, we never moved for it, Your Honor, at the trial level. So I don't know that it should have been stricken because nobody asked for it. Well, it misstated the law. So you would say that's per se an abuse of discretion, right? Perhaps so, Your Honor. Only your expert's opinion should have been admitted. The question is simply, from where does it derive? From where does that duty derive? From where does that standard of care derive? And the Texas Supreme Court has been uniform over the years. There were a couple of things that I wanted to address very quickly, if I may. Justice King noted that, was discussing the facts of this a little bit. One of the things that may actually have led to the ineffectiveness of Wal-Mart's measures to contact Mr. Cavalli's physicians is this was as luck would have it, right before Labor Day weekend. So that probably added to the problems here. If an opinion, an expert's opinion like this has to be based on a regulation, well, more than arguably, this was. Because the regulation also talks about sound professional judgment. And that's all Mr. Brooks is talking about, is exercise of sound professional judgment. Texas courts have held that where there is a regulation that covers things, if it doesn't specify something that is different from what the common law standard is, then the standard that regulation talks about is the reasonable person standard. Put it in a health care context, that's a reasonable health care practitioner. And finally, the Ballard case. I note that Ballard was indeed a pharmacy case. It was in the expert report situation, that proceeding. But the way that I think Ballard does have some application to this is Ballard requires that a pharmacist drill down beyond what is simply written on the bare page. And that's what Mr. Brooks is saying here. Exercise and professional judgment may require doing more than simply looking at what's written down on a piece of paper. And it may require going beyond that. And that's where the heart of professional discretion lies. Sort of. It's interesting. At the end of the day, so to speak, he, she, I guess it was a she, acted as if the prescription said zero. Yes. Zero pills. Because that's what she gave. I mean, whatever it meant, it probably didn't mean zero pills.     Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. All right. Thank you, Mr. Simpson. Your case is under submission. We will take a very brief recess because we're running.